# Rogers, Appellant, v. Toland.

*Corporations—Stock—Transfer of stock—Liability for assessments.*

Where a person subscribes for the stock of a New Jersey corporation, and pays a portion of his subscription and receives a stock certificate in his own name, and subsequently signs the blank transfer on the back of the certificate, and sells and delivers the certificate to a firm of brokers, who in turn sell and turn over the certificate to another party in the same form as they received it, and long afterwards the company levies an assessment, and the original owner from whose name the

stock has not been transferred on the books of the company is compelled to pay the assessment under the laws of New Jersey, he cannot recover the amount thereof from the brokers to whom he sold and delivered the certificate. His only recourse is to the owner of the stock at the time the assessment was levied.

Argued Dec. 15, 1909. Appeal, No. 226, Oct. T., 1909, by plaintiff, from order of C. P. No. 5, Phila. Co., Dec. T., 1908, No. 3,477, discharging rule for judgment for want of a sufficient affidavit of defense in case of Frank G. Rogers v. Edward D. Toland et al., trading as Toland Brothers & Company. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Affirmed.

Assumpsit to recover the amount of a stock subscription which the plaintiff has been compelled to pay.

Rule for judgment for want of a sufficient affidavit of defense.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was order discharging rule for judgment for want of a sufficient affidavit of defense.

*Walter George Smith*, with him *Wm. Rudolph Smith*, for appellant.—The defense in the present case is that by reason of the fact that the ownership of the certificate passed from the defendants to Kurtz & Co. on the day after it was purchased from the plaintiff, thereby their responsibility ceased. This, apparently, was the position first adopted in England: Humble v. Langston, 7 M. & W. 517, but it has long since been changed: Grissell v. Bristowe, L. R. 3 C. P. 112; Kellock v. Enthoven, L. R. 9 Q. B. 241.

The obligation of the parties became fixed at the time of the transaction and could not be shifted by the defendant unless it had transferred the shares on the company's books, not even by notice,—which was never given: Lichten v. Verner, 56 Legal Int. 180.

*Paxson Deeter*, with him *Francis V. Lloyd* and *J. Levering Jones*, for appellee.—The American authorities sustain the judgment of the court below: Brinkley v. Hambleton, 67 Md. 169 (8 Atl. Repr. 904).

Lichten v. Verner, 56 Legal Int. 180, cited by the plaintiff, does not sustain his contention.

He who takes the profit should bear the losses.

The United States circuit court of appeals of the third circuit, in one of the cases arising out of the present receivership, American Alkali Co. v. Kurtz, 138 Fed. Repr. 392, clearly indicated that only two persons are liable to the company for assessments—the registered owner and the real owner.

The case is similar to the assignment of a lease or the sale of a property "under and subject" to a mortgage: Mason v. Smith, 131 Mass. 510; Walker v. Physick, 5 Pa. 193; Academy of Music v. Smith, 54 Pa. 130; Shoenberger v. Hay, 40 Pa. 132.

The English cases sustain the opinion of the court below: Sayles v. Blane, 14 A. & E. Enc. of Law (N. S.), 205; Walker v. Bartlett, 18 Com. Bench, 845; Grissell v. Bristowe, L. R. 3 C. P. 112.

OPINION BY HEAD, J., July 20, 1910:

Prior to June 5, 1899, the plaintiff was the registered owner of 100 shares of the capital stock of the American Alkali Company, a corporation of the state of New Jersey. The par value of each share was $50.00. The plaintiff had paid in ten per cent of his subscription and received a stock certificate in his own name evidencing his ownership pro tanto. It had printed on its back a blank form, by the use of which the owner could readily transfer his shares to another person, and, at his option, provide for the substitution of that person in his stead as the registered owner of the stock.

On June 5, 1899, the plaintiff's brokers negotiated a sale of these shares to the defendant firm, also brokers, for a cash consideration agreed on and then paid, and then

and there turned over the certificate. The plaintiff signed the form on the back of the certificate in blank. That is to say, the form printed was not so filled out as to make the assignment and transfer special to that particular person, but general, with a blank for the name of the transferee so that it could lawfully be filled out any time by inserting therein the name of the then owner of the shares. The transaction as it was executed by the parties in no way differed from the thousands of such sales made every day on the stock exchanges of the country.

On the following day, June 6, 1899, the defendants in turn sold these shares to W. W. Kurtz & Co., turning over to them the certificate just as it had been received from the plaintiff. The defendants at no time thereafter had any interest whatever in the said shares or certificate, and the record does not disclose what subsequent transfers, if any, were made nor who was the real owner of the stock when the assessment now to be mentioned was levied or paid.

In 1901 the directors of the corporation made a call of $10.00 per share, payable in installments, but the plaintiff paid nothing on account thereof. Several years later the company was regularly determined to be insolvent, and its duly appointed receiver, in pursuance of a decree of court, levied an assessment of $2.50 per share to pay its debts. The plaintiff gave notice to the defendants of this assessment and of the suit brought by the receiver to enforce its payment. After litigation it was judicially determined that the plaintiff, as between himself and the company, was liable, and accordingly in January, 1909, he paid the assessment and begun this action to recover from these defendants the money he was thus compelled to pay.

It is not contended that the defendants ever entered into any express covenant, written or oral, in which they obliged themselves to pay anything more for or on account of the stock purchased than the cash price they actually paid at the time of the sale. The plaintiff's claim to re-

cover rests on the propositions that whilst he and the
defendants expressly agreed upon the consideration the
former would accept and the latter pay for the transfer
of the stock, the law of the land wrote into the transaction
an undertaking on the part of the buyer to relieve the seller
of any obligation to the company the latter had volunta-
rily assumed by an original subscription to its stock, or by
his choice to permit his name to stand on the records as
the registered owner of stock he had in fact sold. And
further, that this implied contract of indemnity was to en-
dure not only while the buyer retained his ownership and
right to receive accruing profits, but during the years after
he had, in turn, become a seller and parted with the stock
and every right and interest incident to its ownership.
If this be sound, the implied consideration of the purchase
and sale was, potentially at least, many times that ex-
pressed.

The real question involved is neither the existence nor
the nature of the obligation of the defendants to indemnify
the plaintiff against assessments levied while the former
owned the stock; but whether such obligation has its root
in the fact of ownership and ends when ownership ceases.
The question has been the subject of discussion by text-
writers and courts outside of Pennsylvania and the con-
clusions reached have not been harmonious. We must
then determine which of the two diverging lines of reason-
ing appeals to us as the more forcible and sound, the better
calculated to lead to a judgment that will exhibit no re-
pugnance to precedents established in cases resembling,
in principle at least, the one now before us.

It is but to repeat a legal aphorism to say that it is
primarily the object of our laws and of the courts who
administer them, not to make contracts for individuals
who are sui juris, but to interpret and enforce those which
such individuals make for themselves. When, however,
the statute of a state, its declared public policy, the long-
continued custom of men engaged in particular lines of
trade or business, or the universally accepted dictates of

natural justice and equity have declared that the performance of certain duties or the discharge of certain obligations are but the necessary incidents of prescribed relations, into which men may contractually enter, the voluntary creation of the relation is the like assumption of its incidental obligations; the latter need not be expressed in words.

When a plaintiff then seeks to enforce the performance of a covenant not expressed in his contract, he assumes the burden of showing that such covenant was truly incidental to the avowed object of the contract and of pointing to some recognized basis, of the character indicated, on which the implied obligation rests. And especially should this be true where, as in this case, the results flowing from the alleged incidental or implied covenant far exceed in magnitude and importance the principal ones about which the parties expressly contracted.

The streams of commerce naturally flow along the lines of least resistance. Among the things that men regard as valuable, and therefore the natural subjects of commerce, those are most favored which will most readily pass from hand to hand. And there is a constant tendency to strip these favored subjects of every nonessential characteristic likely to hamper or impede the desired quick and easy transmission of property from seller to buyer. The development of our law of negotiable instruments is an evidence of this tendency. "A courier without luggage" will naturally outstrip its weighted rival. To the same tendency may be ascribed, in large part, the marked inclination of accumulated capital to invest in the class of property designated corporate securities.

This reference to general principles seems to be made necessary by the fact that although we have been aided by the briefs of able counsel, their industry has discovered no precedent in Pennsylvania which distinctly rules the question before us. But men have dealt with property of other kinds under conditions closely resembling those existing here. We see nothing so peculiar about the quality

of the property which was the subject of this contract, as to prevent the application of the well-settled principles that have controlled the transactions of men when buying and selling other kinds of property. In early days land and the various estates that may be acquired and enjoyed in it were perhaps most frequently the subjects of contracts. For instance, estates held by lease were freely aliened. The right of the assignee of a lessee to enjoy the products of the demised land, his obligation to pay the rent reserved, and the period during which both right and obligation were to coexist, have been clearly defined by our courts. So the principles controlling the sale and purchase of land subject to ground rents, mortgages, etc., have been frequently announced.

In Walker v. Physick, 5 Pa. 193, one Latimer conveyed to Walker certain land in fee simple, reserving a certain yearly ground rent which Walker covenanted to pay. Later Walker conveyed the land to Physick in a deed reciting the former conveyance, which reserved the ground rent, and containing the following habendum, "under and subject, nevertheless, to the payment of the aforesaid yearly rent-charge or sum of, etc., so as the same shall hereafter accrue and grow due unto the said Latimer, his heirs and assigns, forever." Physick in turn aliened to Wharton, and after this conveyance the ground rent became in arrears. Latimer recovered judgment against Walker, his immediate vendee and covenantor, for this rent. The latter then brought suit against Physick, his vendee, on a theory which we can in nowise distinguish from that on which the present plaintiff rests his right to recover. In determining that Physick, the vendee of Walker, was not liable to reimburse the latter for money he had been compelled to pay in discharge of the arrears of ground rent accruing after Physick himself had conveyed, GIBSON, chief justice, said: "Now, granting that there was a covenant here, or else a parol contract arising from the acceptance of the deed, what was the scope and end of it? For it can have that extent and no more.

Certainly not to bind the grantee of the freehold forever. No man in his senses would take an estate as a gift which would entail on him a responsibility so endless. The policy of our laws has been to unfetter the transmissibility of property; but, by the interpretation claimed, an inheritance burdened with a ground rent would be rendered nearly, if not altogether, worthless. . . . If the original ground tenant might sue his immediate successor for negligence in the payment of arrears by his assignee, the immediate successor could, in turn, sue his assignee for the default of him who had subsequently become the tenant of the freehold; and thus the matter might go on, producing an endless chain of litigation, lengthened at every change of ownership. It is unnecessary to depict the vexation and expense of such a state of concatenated responsibility. If the costs of each recovery, with interest, were successively added to the next cause of action, the result could scarcely be calculated."

This language could be as truly uttered of the situation now actually before us as of that pictured by the eminent judge from whose opinion we have quoted. The principle thus declared has been, ever since that case, applied to every form of purchase of land subject to the payment of mortgages, taxes or other incumbrances, and it has been steadily held that although each succeeding tenant was liable for the discharge of the rent, taxes, etc., accruing during his ownership, that liability was rooted in the fact of ownership and ceased with it. It is wholly unnecessary that we should here attempt to cite the many cases in which this doctrine has been applied. None of the eminent counsel, whose briefs in this case are before us, has pointed out any satisfactory reason why the law should place the purchaser of stock in a different situation from the purchaser of land when the like circumstances surround both. Every argument that has been advanced, in support of the doctrine that the plaintiff here may recover from the defendants the amount of the assessment, which was not levied until long after the defendants had

parted with their ownership of the stock, could have been as forcibly presented in favor of the right of Latimer to recover in the case last cited.

In recent years the rights of parties interested in what are commonly called gas and oil leases have been frequently settled. The estate of the original lessee in such cases has frequently passed through many different hands, and it has been held that each succeeding assignee of the lease was liable for the discharge of its burdens only during the period of his ownership. The original lessee, by virtue of his contract, is answerable to the lessor during the entire contract period; but when he in turn seeks to recoup moneys he has been compelled to pay, he can look to no one but the real owner of the leased estate upon whom primarily rested the obligation to discharge the covenants of the lease.

Whilst the case of West Philadelphia Canal Co. v. Innes, 3 Whart. 198, is not precisely similar in its facts to the one before us, the alleged liability of the transferee of certain stock for installments of the subscription price, called after he in turn had parted with it, certainly rested on as strong grounds as any that can be urged in support of the liability of the defendants in the present case. We think, therefore, we may with propriety quote the following language from the opinion of KENNEDY, J., in that case: "As each share of the stock, however, whether fully paid or not, is made transferable by the act under which the company was incorporated at the pleasure of the stockholder 'subject to all payments due or to become due thereon;' and the assignee thereof is made expressly liable by the act 'to be sued for all balances and penalties due on such share as the original subscriber would have been,' it is perfectly clear that there is no ground for holding such assignee liable for payments falling due after he has parted with the stock; for, having parted with the stock, he is no longer a stockholder, and both the letter and spirit of the act show that it is because he is the holder of the stock that he is made liable to be sued for arrearages

due on it; and that as soon as he ceases to be the owner or holder of the stock his liability for all payments falling due subsequently thereto ceases also."

We do not regard either Baily v. Schroyer, 1 Sadler, 128, nor Trevor v. Perkins, 5 Whart. 244, as authority for the proposition here contended for by the appellant. In the former, the case turned on a disputed question of fact, Schroyer, the assignor of the stock, "alleging that it was a part of the agreement between the two for the sale of the stock that Baily should take Schroyer's place in the bank and bear the losses, stand in Schroyer's shoes and relieve him from all liability and responsibility. . . . Baily denied any such agreement." The jury found in favor of Schroyer on all of the points, and therefore the important question now before us was not involved in that case. In the other case cited, Trevor, the assignor of the stock, at the time of the sale executed and delivered to Perkins, his assignee, a special power of attorney authorizing the transfer and assignment to Perkins, by name, of all the shares then standing on the books of the company in the name of the assignor, "subject to the payment of the remaining installments by the said Thomas J. Perkins, or his assigns, as the same may be called in," etc. This was accepted and retained by Perkins. There was also testimony by a witness to the transaction that the parties had made some arrangement, the details of which he could not give, with reference to the unpaid installments. The Supreme Court, after considering the effect to be given in an indenture of assignment of a lease by a lessee, to the words "subject to the rent reserved in the lease," and citing and examining certain English cases, said: "However that may be in a court of law, in formal conveyances in which the parties have selected certain terms, and omitted others, from which and from the subject-matter it is inferred that there was no agreement intended, it does not apply to those cases where there is a contract, whether verbal or written, amounting to an agreement to indemnify, . . . . and if there was in this

case evidence to satisfy a jury that there was such a contract or such agreement was to be inferred from the transaction, the plaintiff is entitled to recover." It was for the reason indicated in the language we have quoted that the judgment of the court below was reversed and the case sent back for another trial.

In Lichten v. Verner, 8 Pa. Dist. Rep. 218, a careful and able opinion was delivered by the learned trial judge (AUDENRIED, J.), but the case did not present the question now before us. Lichten subscribed for shares of stock, paid a portion of the subscription price, and received a certificate. The stock was sold to Verner and the certificate, indorsed in blank, turned over to him. In fact he bought, not for himself but for an undisclosed principal. The stock was not transferred on the books of the company and Lichten, having been compelled to pay a call, sued Verner for reimbursement. The record shows no subsequent assignment of the stock. It remained in the ownership of the assignee of the subscriber at the time of the call. His liability to respond either to the company or the subscriber, under these circumstances, no one denies. With the liability of an agent who buys for an undisclosed principal we have no concern. The questions there decided are, therefore, clearly outside the field of our inquiry.

We do not feel called upon to enter into an analysis of the English cases on this question, to determine whether or not the courts of that country have changed front, and now accept the conclusion urged on us by the appellant. It is quite certain that a long line of the older cases declared the doctrine which seems to us supported by the better reasoning and sounder policy. How far the opinion of the court in Kellock v. Enthoven, L. R. 9 Q. B. 241, is controlled by the facts of that case and the English statute applicable thereto we shall not attempt to declare. We may remark, however, that, under the English statute, both assignor and assignee were liable to the company. It chose to collect from the former, and the question in-

volved was whether, under the circumstances, he could recover from his assignee. Here the plaintiff seeks to make respond one who, neither at common law nor under any statute, was ever liable to the company. Whilst it cannot be denied that in some of the cases cited, from foreign jurisdictions, there are expressions in the opinions that would support the contention here advanced by the appellant, no one of them can fairly be said to be "on all fours" with the case before us. Even if we recognized their authority, therefore, the exact question we have to answer would still remain an open one.

These English cases are reviewed and analyzed in an opinion by ALVEY, C. J., speaking for the supreme court of Maryland, in Brinkley v. Hambleton, 67 Md. 169 (8 Atl. Repr. 904). The case there arose under a statute of the state of Virginia. After discussing the rights and obligations of the parties under the statute, the chief justice proceeds to consider these matters in their more general aspect in the following language: "Now, it is very true that, by the statute law of Virginia, each and every assignor and assignee remains liable to the company for the calls that may be made upon the stock, until the full par value be paid. But, as between the assignor and assignee of the shares, there is a primary and a secondary obligation. The primary obligation to pay calls, by the principles of the common law, rests, as we have said, upon the actual owner and holder of the stock during the time of his ownership; and any previous assignor, whom the company might require to pay such calls, would pay by force of his statutory obligation, and because of the failure of the holder of the stock to perform his duty or obligation assumed upon the transfer of the stock to him, and not because of any failure of performance of duty or obligation, either express or implied, by those who had held the stock before the last transfer. Any payment, therefore, of calls by any previous holder of the stock, must, in the contemplation of the law, be made for the party whose primary duty and obligation it was to make such payments,—not for the special

benefit of the immediate transferee of the party who has been required to pay, by force of the statute, calls made upon the stock after his transferee has become an assignor of the stock to another party. In other words, there is no implied promise or obligation on the part of an assignee of stock to pay calls made subsequent to his transfer of the shares for the relief of a prior assignor, though the latter may have been required to pay such calls to the company." The common-law principle, that only the owner of the stock can be made to respond to a call for the unpaid subscription price, is not questioned, and the reasoning therefrom, indicated in the language quoted, seems to us to be logical and sound.

Let us turn then to the situation of the parties at the time of the transaction in suit. The plaintiff, as we have said, was the registered owner of the shares. They were freely alienable. When he came to sell them he could have insisted, if he chose, that his vendee must take his place as registered owner. He had within his own control the means to effectuate that intention if he entertained it. Or he might sell his shares and turn over the evidence of ownership by a blank indorsement so that his vendee could in turn readily dispose of them. This he elected to do. It is a matter of common observation in the commercial world that, other things being equal, a security in such form that it may pass by delivery, has a higher market value than its fellow so designed that each transfer, at the expenditure of some time and money, must be completed on the records of the corporation issuing it. The daily market quotations of the common and registered bonds of the United States illustrate this. Whether the plaintiff actually got or believed he could get a higher price by indorsing his certificate in blank we can only surmise.

The purchase price he demanded for his stock was but $250, and this the purchaser paid. It would seem to us to be unreasonable to hold that, as an incident to this transaction, the purchaser was bound to assume a possible responsibility that might require him to pay the fur-

ther sum of $4,500.   We may grant the soundness of the proposition that where one takes over property, the ownership of which may bring with it profit or loss, the right to receive the profits creates the correlative liability to pay losses, but both right and obligation, in this view of the case, are coextensive.   As long as the defendants were the real owners of the stock and entitled to receive any dividends upon it, it would be inequitable to say that they were not liable for assessments made necessary during their ownership.   But years before the assessment in this case was made the defendants, in the exercise of their right, had sold the stock, and the right to receive its profits, with the correlative obligation to discharge any assessments, had passed on in the channel of commerce into which this certificate was launched by the blank indorsement of the plaintiff.

It is agreed that after the defendants parted with their stock they were under no obligation to the company which the latter could enforce.   The payment, therefore, of the assessment by the plaintiff was in no way in relief of these defendants, nor was it for the improvement of their property.   The contract of indemnity sought to be fastened upon them was in no way a necessary incident of the main purpose of the transaction which was to transfer the ownership of the shares from the plaintiff to the defendants.   The former, either because he was the original subscriber, or because he permitted his name to remain on the books of the company as registered owner, incurred a liability with which he was not obliged to incumber his stock.   He may have chosen to take the risk of his possible liability becoming an actuality, and may have preferred to sell his stock for the best price he could get without regard to the future.   In a word, the transfer of this possible liability was no necessary part of the sale of his stock unless he chose to make it so.   So far as the record shows, he did not so elect, and we are unable to find any satisfactory ground upon which to predicate the conclusion that every man who purchases a share of stock im-

pliedly agrees with his vendor, not only that he will discharge the burdens imposed upon that stock while he owns it, but all other burdens that may thereafter come, owing to the default or negligence of those who, years afterwards, may succeed him in that ownership.

After the most careful consideration that we have been able to give to every aspect of the question involved, realizing as we do its great importance, we are impelled to the conclusion that the learned court below was right in holding the affidavit of defense sufficient to prevent judgment.

Appeal dismissed at the costs of the appellant, but without prejudice, etc.